UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
-----------------------------------------------------X
                                         :
UNITED STATES OF AMERICA,                :
                                         :
                                         :
         -against-                       :
                                         :
VINOTH PONMARAN,                         :
                                         :
                   Defendant.            :
-----------------------------------------------------X
```

19 Cr. 667 (PAC)

**OPINION & ORDER**

      Vinoth Ponmaran ("Ponmaran"), facing charges of conspiracy to commit wire fraud, wire fraud, and conspiracy to commit money laundering, was arrested on July 15, 2022, as he attempted to enter the country at the United States-Canada border.  Agents read Ponmaran his rights, which he and the agents discussed for some time before Ponmaran signed a waiver and agreed to speak to them.  He now moves to suppress his post-arrest statements, arguing that (1) he invoked his right to counsel at three points during his initial discussion with the agents, and (2) he did not voluntarily or knowingly waive his rights.  The Court concludes that Ponmaran did not unambiguously or unequivocally assert his right to counsel at any point during the interview, and that he waived his rights without coercion and with a full appreciation of the implications of his waiver.  Accordingly, the Court **DENIES** Ponmaran's motion to suppress.

## BACKGROUND

### I.    The Arrest

      On July 15, 2022, Ponmaran was arrested at approximately 1:30 PM near Blaine, Washington, as he attempted to enter the United States from Canada.  His arrest was pursuant to a grand jury indictment alleging that Ponmaran was involved in a fraud scheme designed to trick victims into thinking that their computers were infected with malware so that they would pay

members of the conspiracy to repair their computers. Ponmaran has been charged in a superseding indictment on three counts: (1) conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349; (2) wire fraud, in violation of 18 U.S.C. §§ 1343 and 2; and (3) conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h). ECF No. 121. Once in custody, and still at the border, Ponmaran was taken to an interview room. He spoke to Homeland Security Investigations ("HSI") Special Agent Colin Corral and HSI Task Force Agent Adam Flet. HSI Special Agent William Dempsey, the case agent, later joined via telephone.

## II.   The Interrogation

The agents audio recorded their interrogation. It began with Ponmaran providing personal information, including that he is a citizen of India, and then Agent Corral noted on the record that he showed Ponmaran a copy of the arrest warrant and that "before we ask you any questions it is my duty to advise you of your rights." Tr. 1:6–18, ECF No. 129-1.[1] After reading the standard *Miranda* warning, Agent Corral asked, "Do you understand all those rights?" *Id.* 1:18–2:3. Ponmaran responded, "Yep." *Id.* 2:4. Agent Corral confirmed, "you are good with English right?" *Id.* 2:5. Ponmaran responded, "Yeah, I'm good with English." *Id.* 2:6.

Ponmaran then asked the agents questions about his rights for approximately six minutes. During that time, he referenced an attorney at three points. He first asked questions about an attorney after initially agreeing to speak to the agents:

> Special Agent Corral ("CC"): Do you want to talk to us today and try and clear some stuff up?
>
> Ponmaran ("VP"): Yeah, sure, but um like when would the attorney will come into the picture? Is it something I need to get one?

[1] For convenience, the Court cites to the written transcript of the recording. ECF No. 129-1. The Court also listened to the audio recording submitted by Ponmaran. ECF No. 129-2.

CC: Um, it's completely up to you. Normally, um, if you–like I said, if you want to talk to us, um, you would get one after we take you to court and if you have a private attorney, then you have the ability to call them and–

VP: No, I don't know. I don't even know what's going on. So I don't have any attorney.

CC: Okay.

VP: But as it's mentioned here, "you will be appointed one"–

CC: Right–

VP: So that's what I was asking. Is that something–

CC: Yeah, if you cannot afford an attorney, one will be appointed to you before questioning if you wish or after. We don't have anything where we can call and get you an attorney here right now. So it would be probably after you see the judge, they would assign you an attorney. If you can't afford one or don't have your own.

*Id.* 2:7–21.

In response, Ponmaran reaffirmed his desire to know "why [he's] here and what's going on." *Id.* 2:22. Agent Corral explained that Ponmaran was arrested pursuant to a warrant; the next step would be "to see a judge" in Seattle, Washington at which point "everything is up to the judge," but they "didn't make the cut off today" to get to the courthouse so Ponmaran would "be in the federal lockup until Monday morning." *Id.* 3:4–13. Ponmaran asked about the requirement to "be presented in front of the judge" regardless of whether he spoke to the agents: "I can talk to you and I still need to go with you right? Irrespective if I talk to you or don't talk to you, is that right?" *Id.* at 3:16–21. Agent Corral confirmed that Ponmaran was correct. *Id.* 3:22, 4:3.

Ponmaran mentioned an attorney for the second time when Agent Corral followed-up on his original question: whether he had "information or something" to share. *Id.* 4:5.

VP: No because–because we cannot proceed until we go for this. We want to know the details, like why I'm being–like why there's even a warrant for my name. So that's why I was looking for the attorney, so because they would be able to tell me what's going on and go from there, right? If I'm not wrong.

3

CC: Yes, um, like I said, I cannot discuss the case any further with you unless you decide you want to talk to me. So it's up to you. Um, as I said, I'm going to, if you decide you want to talk to us, I'm going to get the case agent on the phone. And he will have more specifics and he can answer your questions better than I can. But, um unfortunately to do all that stuff, it's up to you. You either have to agree to talk to us or not agree to talk to us. It's up to you. You have the right to not talk to us, or to say I want to wait for an attorney. Or whatever. You need to make the decision.

*Id.* 4:6–16.

Ponmaran referenced an attorney for the third time when he asked his final questions about his rights; he then agreed to speak to the agents:

VP: After talking to you guys, will I still be able to get the attorney afterwards or no?

CC: Of course, um, like I said here, if you decide to answer questions now, you still have the right to stop the questioning at any time. Uh, if you don't like the first question I ask you, then you can say, "I'm done, and"–

VP: Okay.

CC: –"I want to stop it."

VP: Alright, I'll proceed. No worries.

*Id.* 5:2–8.

Agent Corral referred Ponmaran back to the form and read him the waiver, which says that his rights have been read and explained, that Ponmaran "fully understand[s]" his rights, that he "waive[s] them freely and voluntarily without threat or intimidation" or "promise of reward or immunity." *Id.* 5:9–12. Ponmaran signed his initials beside each *Miranda* warning on the top of the form and signed the waiver at the bottom of the page. Gov't Ex. A, ECF No. 137-1. Ponmaran then substantively discussed the charges for approximately three hours.

## DISCUSSION

Ponmaran moves to suppress his post-arrest statements on two grounds. First, he asserts that he invoked his right to counsel at the three points he mentioned an attorney during his initial

discussion with the agents.  Second, he argues that he did not knowingly or voluntarily waive his right to counsel.  The Court begins with Ponmaran's purported invocation.

## I.    The Right to Counsel and Effective Invocation

### A.  Legal Standard

The protections of both the Fifth and Sixth Amendments apply to Ponmaran's post-arrest interrogation.  The Fifth Amendment ensures that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself."  U.S. Const. amend. V.  To "assure that the individual is accorded his privilege under the Fifth Amendment to the Constitution not to be compelled to incriminate himself," an individual must be advised of his right to have counsel present during custodial interrogation as part of the warnings given pursuant to *Miranda v. Arizona.*  384 U.S. 436, 439, 470, 473 (1966).  The Sixth Amendment similarly protects the right of "the accused" to have counsel assist "in all criminal prosecutions."  U.S. Const. amend. VI.  However, the Sixth Amendment "does not attach until a prosecution is commenced, that is, 'at or after the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.'"  *McNeil v. Wisconsin*, 501 U.S. 171, 175 (1991) (quoting *United States v. Gouveia*, 467 U.S. 180, 188 (1984)).  Taken together, an indicted defendant "subject to custodial interrogation,"—i.e., someone in Ponmaran's position—"has the right to consult with an attorney and to have counsel present during questioning."  *See Davis v. United States*, 512 U.S. 452, 457 (1994).

After the defendant is advised of his right to an attorney, the defendant has two routes: he may choose to waive his right to have an attorney present, or he may ask for the assistance of counsel, at which point the officer must end all questioning and cannot re-engage "until a lawyer has been made available or the suspect himself reinitiates conversation."  *Id.* at 458.

5

An individual who desires the assistance of counsel must request an attorney "sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Id.* at 459. The "suspect must unambiguously request counsel" to effectively assert the right. *Id.* In other words, "if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel," there has been no invocation. *Id.* In addition, the invocation is effective "only when the suspect 'has *expressed*' his wish for the particular sort of lawyerly assistance that is the subject of *Miranda*," like a "statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney *in dealing with custodial interrogation by the police.*" *McNeil*, 501 U.S. at 178 (brackets removed) (quoting *Edwards v. Arizona*, 451 U.S. 477, 484 (1981)). For example, the Second Circuit has found that the following statements are "insufficient to constitute an unambiguous request for counsel": "Maybe I should talk to a lawyer," "Do you think I need a lawyer?", and the statement that the suspect "was going to get a lawyer." *United States v. Oehne*, 698 F.3d 119, 123 (2d Cir. 2012) (citing cases). "The bare reference to a lawyer, therefore, is not sufficient to invoke the right to counsel." *United States v. Lights*, 208 F. Supp. 3d 568, 574 (S.D.N.Y. 2016).

B. Application

Ponmaran argues that he clearly expressed his desire for an attorney at three points in his initial discussion with the agents: first, his question "when would the attorney will come into the picture?" shortly followed by a request for clarification about the portion of the Statement of Rights form that explains if the defendant cannot afford an attorney one "will be appointed"; second, in response to Agent Corral's question whether Ponmaran had information he wanted to share, Ponmaran stated "No because–because we cannot proceed until we go for this. We want to know

the details, . . . . So that's why I was looking for the attorney, so because they would be able to tell me what's going on and go from there, right?"; and finally, Ponmaran asked "After talking to you guys, will I still be able to get the attorney afterwards or no?"  None of these statements are sufficient to lead a reasonable officer in the circumstances to believe that Ponmaran was unambiguously requesting an attorney.

First, Ponmaran's statements reflect his desire for information about the scope of his rights, not a request for an attorney's assistance.  The first exchange could be reasonably understood as merely a question about *when* an attorney would "come into the picture."  Similarly, the third exchange probes whether Ponmaran would be waiving his right to counsel in the future if he spoke with the agents at that time.  Courts in this District have held that those types of requests for information about the timing and mechanics of the process are not clear requests for counsel.  *See, e.g., United States v. Peter*, No. 17 CR 054 (NRB), 2018 WL 5282878, at *3 & n.3 (S.D.N.Y. Oct. 24, 2018) (holding that "So when can I see an attorney and the judge?" would not effectively invoke the right to counsel because courts "routinely reject the contention that such inquiries into the operation of the right to counsel constitute invocations of that right"); *United States v. Pinto-Thomaz*, 357 F. Supp. 3d 324, 335, 341 (S.D.N.Y. 2019) (concluding that "questions about the process going forward and the process for obtaining counsel," such as the question "when I get to pretrial, am I going to get a lawyer?" are not invocations).

In addition, officers are not required to end an interrogation because a defendant suggests that he is interested in relying on an attorney in the future, as Ponmaran did in his third exchange with the agents.  Ponmaran began with his willingness to speak to the agents ("*After* talking to you guys . . .") and sought to clarify what the implications of speaking to them would be on his future ability to obtain a lawyer (". . . will I still be able to get the attorney *afterwards*").  That question

did not express his desire to have an attorney assist during the interrogation. *See United States v. Scarpa*, 897 F.2d 63, 66, 69 (2d Cir. 1990) (holding that the defendant failed to invoke the right to counsel when he stated, after arrest, "that he didn't have a lawyer" but he "was going to get a lawyer"); *United States v. Lifshitz*, No. 03 CR. 572 (LAP), 2004 WL 2072468, at *10 (S.D.N.Y. Sept. 15, 2004) (concluding that although the defendant left a voicemail asking someone to be his attorney he "never articulated a desire to have counsel present" because he did not communicate to the agent "that he wanted to wait for a lawyer to continue the interview").

Ponmaran's statements were also full of equivocation and vagueness. In the second exchange, while he initially said "No" after Agent Corral asked if there was information he wanted to share, his subsequent statement, "we cannot proceed until we go for this" created significant ambiguity. At no point did Ponmaran clarify what he meant by "go for" or "this." He instead went on to ask if an attorney could "tell me what's going on and go from there, *right*? *If I'm not wrong*?" Ponmaran's shifting language and questions about the role or value of an attorney are not clear requests for counsel. *See, e.g.*, *United States v. Freeman*, No. 21-CR-88-3(JSR), 2021 WL 3855871, at *4 (S.D.N.Y. Aug. 27, 2021) (concluding that the following statements were equivocal: "I'm not saying you're forcing my hand but do — because for now there's no lawyer to represent me. But there is somebody that I know. I don't know whether I can talk to him? I don't know." (footnote omitted)); *United States v. Figaro*, 568 F. Supp. 3d 459, 469 (S.D.N.Y. 2021) (concluding that defendant's question "do I need my lawyer?" amounted to a "question as to *whether he needed an attorney*," which "does not convey" a desire to have counsel present). "Where a defendant merely references a lawyer or inquires as to the potential need for one, the law does not require agents to stop their questioning." *Figaro*, 568 F. Supp. 3d at 469.

Ponmaran is correct to note that in addition to the context provided by viewing the three exchanges together, the circumstances surrounding the interrogation are also relevant to the Court's determination. Ponmaran Motion 9, ECF No. 128 (noting that Ponmaran is "a foreign citizen," "unfamiliar with American law at the time of the interrogation," and "had no prior experience with any criminal justice system"); *see also Wood v. Ercole*, 644 F.3d 83, 91 (2d Cir. 2011). While there is no dispute that Ponmaran was unfamiliar with this country's criminal justice system, that context does not undercut the Court's conclusion that if Ponmaran requested counsel it was, at best, ambiguous. Even if he was unfamiliar, Ponmaran's voice appeared calm during the initial exchanges, and he spoke up to ask many clarifying questions. Ponmaran also confirmed at the outset that he was comfortable speaking to the agents in English. By the end of the third exchange, Ponmaran seemed fully satisfied with the agent's answers to his questions and stated, "Alright, I'll proceed. No worries," further supporting that even if he was conflicted initially, he ultimately concluded he did not want to speak to an attorney before proceeding. In sum, Ponmaran's statements were ambiguous and equivocal, so the agents were "not required to end the interrogation or ask questions to clarify whether" he wanted to invoke his right to counsel. *See Berghuis v. Thompkins*, 560 U.S. 370, 381 (2010) (citation omitted).

## II.   Waiver

Ponmaran argues that independent of whether he effectively invoked the right to counsel, his statements must be suppressed because he did not knowingly or voluntarily waive his rights.

### A.   Legal Standard

"Even absent the accused's invocation" of his rights, statements made during custodial interrogation are "inadmissible at trial unless the prosecution can establish that the accused 'in fact knowingly and voluntarily waived [*Miranda*] rights' when making the statement." *Id.* at 382 (alteration in original) (quoting *North Carolina v. Butler*, 441 U.S. 369, 373 (1979)). For a

defendant to waive his rights, the court must find by a preponderance of the evidence: (1) "that the relinquishment of the right was voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception," and (2) "that it was made with the requisite level of comprehension, i.e., a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *United States v. Medunjanin*, 752 F.3d 576, 586 (2d Cir. 2014) (internal quotation marks and citations omitted). "Whether a waiver is 'knowing and voluntary' is a question directed to a defendant's state of mind, which can be inferred from his actions and statements." *United States v. Spencer*, 995 F.2d 10, 11 (2d Cir. 1993). The Court considers the totality of the circumstances, including the defendant's characteristics, the conditions of the interrogation, and the conduct of law enforcement officials. *United States v. Anderson*, 929 F.2d 96, 99 (2d. Cir.1991).

B. <u>Application</u>

The record supports that through his express statements and his "course of conduct," *United States v. Plugh*, 648 F.3d 118, 127 (2d Cir. 2011), Ponmaran knowingly and voluntarily waived his rights. First, Ponmaran heard, read, and discussed his rights before expressly waiving them. Special Agent Corral advised Ponmaran of his rights orally, provided the written statement of those rights for Ponmaran to review, confirmed that Ponmaran understood those rights (and Ponmaran replied "Yep" that he understood them), and discussed the contours of those rights with Ponmaran for approximately six minutes. After all that, Ponmaran signed the Statement of Rights form, writing his initials next to each *Miranda* right to indicate that he understood each one and signed his name below the paragraph stating that he understood he was waiving his rights. His signing of the form is strong evidence that Ponmaran understood his rights and the consequences of waiving them but voluntarily waived them. *See, e.g., id.* (concluding that the defendant's signing of "an express 'waiver-of-rights' form before making the inculpatory

statements[,] . . . alone, is enough to strongly support" that the defendant "knowingly and freely waived those rights before speaking"); *Spencer*, 995 F.2d at 12 (affirming that the defendant's waiver was knowing and voluntary where "he read the form," acknowledged "that he understood all his rights," and "told the agents that he was prepared to answer their questions").

In addition, the back and forth that ensued demonstrates that Ponmaran understood his rights but chose not to exercise them. For example, he asked when an attorney would "come into the picture," whether he would have to hire one himself, and whether he could "go home today" even if he spoke to the officers. Tr. 2:8–21; 4:1–2. Ponmaran even referred directly to the Statement of Rights form to ask about the attorney-appointment process. *Id.* 2:15. Those questions reflect that he sufficiently understood his rights. Ponmaran then, understanding those rights, proceeded to speak with the agents without an attorney present, further supporting that he knowingly and voluntarily waived those rights. *See Berghuis*, 560 U.S. at 385 ("As a general proposition, the law can presume that an individual who, with a full understanding of his or her rights, acts in a manner inconsistent with their exercise has made a deliberate choice to relinquish the protection those rights afford.").

The circumstances of the interrogation also support that his waiver was voluntary. The interaction with the agents was not coercive. Ponmaran has not argued that he was "threatened physically or psychologically abused in any manner." *See Plugh*, 648 F.3d at 128. The discussion about his rights proceeded in a standard interview room in the middle of the day; Ponmaran had just been arrested at the border of the United States—a place where he should have expected to encounter law enforcement—and spoke to Agent Corral, who maintained a calm voice and immediately advised Ponmaran of his rights. *See, e.g.*, *Berghuis*, 560 U.S. at 386–87 (noting that the statement was not coerced where the interrogation occurred in a "standard-sized room in the

11

middle of the afternoon" while the defendant sat in "a straight-backed chair for three hours"). Though Ponmaran is a non-citizen who was inexperienced with the American criminal justice system at the time of the interrogation, he indicated he was comfortable proceeding in English, and he confidently asked the officers questions about his rights.

However, according to Ponmaran, he did not knowingly or voluntarily waive his rights because of the content of the agent's responses to his questions about his rights. As to his lack of ability to perceive the implications of waiving, he argues that the agent's response to Ponmaran's back-to-back questions about how to receive an attorney ("Um, it's completely up to you. Normally, um, if you–like I said, if you want to talk to us, um, you would get [an attorney] after we take you to court . . . ." Tr. 2:8–12) confusingly suggested Ponmaran would not be able to see an attorney until after speaking with the agents. In support of that argument, Ponmaran relies on *United States v. Murphy*, where post-arrest statements were suppressed because the officer's incorrect recitation of the *Miranda* warnings suggested the defendant would waive his rights if he remained silent. 703 F.3d 182, 193 (2d Cir. 2012). But unlike in *Murphey*, Agent Corral's immediate response to Ponmaran's compound question was, at most, incomplete. In that direct response, he said how the process would work "if [Ponmaran] want[s] to talk" without explaining the process if Ponmaran did not want to speak to the agents. Regardless, Agent Corral immediately clarified what he said, explaining that if you cannot afford an attorney, "one will be appointed to you *before questioning* if you wish *or after*," and later explained the process if Ponmaran invoked his rights. *Id.* 2:18–21 (emphasis added). That "slight variance from the standard *Miranda* warnings" does not "necessarily invalidate a defendant's waiver" because "'no talismanic incantation is required to satisfy [the] strictures' of *Miranda*." *Murphy*, 703 F.3d at 193 (alteration in original) (quoting *Duckworth v. Eagan*, 492 U.S. 195, 202–03 (1989)). Moreover, there is no

dispute that the initial reading of the *Miranda* warning was proper. Ponmaran adds that his question minutes later about whether he would "still be able to get the attorney afterwards" demonstrates his continued confusion. Tr. 5:2. To the contrary, in context, his question confirmed that his initial waiver would not change his future ability to seek counsel. Agent Corral further responded that "[o]f course" Ponmaran could later obtain an attorney and that if Ponmaran decided to participate in the interrogation—a decision the agent did not assume Ponmaran made at that point—he also maintained the ability to assert his right to silence and "to stop the questioning at any time." *Id.* 5:3–4. The agent's fielding of Ponmaran's questions adequately reaffirmed the substance of the *Miranda* warnings without calling Ponmaran's understanding into doubt.

Ponmaran separately argues that Agent Corral effectively forced him to waive his rights so that he could receive information about the charges, making the waiver involuntary. Ponmaran points to when Agent Corral said towards the tail end of the initial discussion that "if you want to know any details further, if you want to clear stuff up, um then you have to waive your rights and agree to talk to me." Tr. 3:8–15. Ponmaran asserts when coupled with Agent Corral's assertion that no attorney could be appointed until after the weekend, *id.*, his statement was coercive.[2] While there are instances where withholding information can be coercive, the totality of the circumstances here do not lead to that conclusion. For example, in *Anderson*, the Second Circuit held that the officer seriously misled the defendant into believing that he had "a choice either to

---

[2] The Court notes that Ponmaran, for the first time in his reply brief, asserts that Agent Corral was "incorrect[]" to say that no attorney was available until after the weekend. Ponmaran Reply Br. 8, ECF No. 141. Ponmaran's vague disagreement that does not contest the underlying factual basis for the agent's statement does not warrant a hearing to resolve the purported factual dispute. *United States v. Parrilla*, No. 13 CR. 360 AJN, 2014 WL 1621487, at *4 (S.D.N.Y. Apr. 22, 2014) (citation omitted), *aff'd sub nom. United States v. Kirk Tang Yuk*, 885 F.3d 57 (2d Cir. 2018). ("[A] defendant is not entitled to an evidentiary hearing on a motion to suppress unless they 'can show a contested issue of material fact with respect to the issue for which the hearing was requested.'").

cooperate or to request a lawyer and forego cooperation forever," which "pose[d] a serious constitutional problem" that made the defendant's confession involuntary. 929 F.2d 96, 100 (2d Cir. 1991). By contrast, in *United States v. Lynch*, the Second Circuit held that it was not coercive for an officer to tell the defendant that he must waive his rights if he "wanted the agents to answer his questions *at that moment.*" 92 F.3d 62, 66 (2d Cir. 1996). Without threatening that the defendant would forfeit "any future opportunity to have his questions answered by government officials," the agents in *Lynch* "wisely sought a voluntary waiver before entering into the discussion that [the defendant] solicited" about his crimes. *Id.*; *see also Colorado v. Spring*, 479 U.S. 564, 575, 577 (1987) (failing to tell the defendant the "potential subjects of interrogation . . . affect only the wisdom of a *Miranda* waiver, not its essentially voluntary and knowing nature").

Here, the agents' conduct was not inherently coercive. Unlike *Anderson*, there is no indication that the agents intended to mislead Ponmaran to make a confession by explaining that, given the time on a Friday and their current location, he might have to wait until Monday for more information. The agents also did not suggest that it was Ponmaran's only opportunity to cooperate or that his cooperation could lead him to a drastically different outcome: they explained that regardless of what he did, he would not "go home" that day. Nor did the agents refuse to answer all questions; prior to Ponmaran's waiver, they refused to answer only those questions that clearly probed the charges. And as Agent Corral repeatedly advised, he could have stopped the interrogation at any time, which he could have done after receiving more information.

## **CONCLUSION**

For the foregoing reasons, the Ponmaran's motion to suppress his post-arrest statements is

**DENIED**.  The Clerk of the Court is directed to close ECF No. 127.

Dated: New York, New York
       December __, 2023

SO ORDERED

_____
PAUL A. CROTTY
United States District Judge

15